**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

FRIENDS OF ANIMALS,
     Plaintiff,

v.

U.S. BUREAU OF LAND MANAGEMENT, an agency of the United States,

     Defendant.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.     It is well documented that the Bureau of Land Management (BLM) has a wild horse problem. Over the last decade, BLM has dramatically increased the level of wild horse removal actions on federal public lands in the western United States. BLM claims that wild horses are overpopulating the American west, contributing to poor range conditions.

2.     The truth is wild horses are far outnumbered by cattle and sheep which graze on western federal public lands. It is well documented that domestic grazing has had a detrimental impact on public lands and the environment. On the other hand, wild horses are native to North America, and have far less impact on native vegetation.  Still, BLM policies favor domestic animal grazing.

3.     Many observers of the BLM program have found that BLM prioritizes using public lands under its regulation for use by commercial activities, like grazing. To accommodate these commercial uses, BLM works to reduce the overall number of wild horses on BLM public lands. In some cases, BLM has announced it will zero out wild horse populations altogether.

4.      This has led to the removal of tens of thousands of wild horses from public lands. The problem for BLM is what to do with the horses once removed.

5.      The American public has generally not supported the destruction, killing, or slaughter of wild horses. In fact, a 2017 survey showed that more than 70% of the respondents did not support the slaughter of wild horses. Congress has responded, outlawing the slaughter of wild horses since 2014.

6.      Attempts to sell or adopt these horses into good homes have not proven successful. There are simply not enough individuals willing to take on the cost of raising the horses, or the unique challenge associated with keeping a once wild mustang.

7.      This has led to the housing of tens of thousands of horses at BLM holding facilities or on private ranches contracted to store horses at a tremendous cost to taxpayers.

8.      Unable to gain Congressional permission to slaughter the removed horses, BLM has instead attempted to incentivize sales and adoption, while also removing safeguards that would prevent private purchasers and adopters from reselling the horses for slaughter for commercial use of the meat.

9.      In the past 10 years, BLM has repeatedly been found to have relaxed its policies to prevent such resales from happening. They have taken virtually no action to prevent it.

10.     BLM's most recent adoption plan has stripped away almost all safeguards, and once again America's wild horses are finding their way to slaughter facilities. Approved in 2019, the Adoption Incentive Program (AIP) offers a financial incentive of $1,000 total per animal adopted, along with a minimum adoption fee of $25 per animal.

11.     BLM's ability to continue to remove horses is now directly tied to the agency's ability to come up with a more effective sale and/or adoption program. The cost of housing more horses is a growing barrier to removing more horses from the range. The AIP

2

thus seeks to encourage transfer of horses to private parties, making room at existing holding facilities to accommodate more removed horses.

12.    Friends of Animals challenges the AIP on three grounds. First, the policy is a rule subject to notice and comment rulemaking under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* In issuing the policy, BLM failed to follow the proper procedures. Second, the AIP violates Congress' prohibition on the slaughter of wild horses. The prohibition states: "Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products." Pub. L. No. 115-141, 132 Stat. 348, Pub. L. No. 116-6, 133 Stat. 13, Pub. L. No. 116-94, 133 Stat. 2534, Pub. L. No. 116-260, 134 Stat. 1182. Finally, the AIP was approved without complying with the National Environmental Policy Act (NEPA). BLM never considered the environmental impacts of the AIP—including the impact of removing horses from the wild and, of course, their slaughter—or analyzed alternatives to the AIP, such as reducing the number of roundups, expanding herd management areas, or even developing greater safeguards to prevent adopted horses from ending up in slaughterhouses.

**LEGAL BACKGROUND**

**A.    The Wild Free-Roaming Horses and Burros Act.**

**1.    Statutory provisions.**

13.    In 1971 Congress passed the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq.* Congress found that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331.

14.     "It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death." 16 U.S.C. § 1331.

15.     The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

16.     It is the duty of BLM to ensure that, "when determined by the Secretary on the basis of current inventory of lands within [her] jurisdiction, information contained in any land use plan (LUP) or court ordered environmental impact statement (EIS), and any other additional information that an overpopulation exists and action is necessary to remove such animals," that those wild free-roaming horses and burros are "humanely captured and removed for private maintenance and care for which [s]he determines an adoption demand exists by qualified individuals." 16 U.S.C. § 1333(b)(2).

17.     It is the duty of the Secretary to "assure humane treatment and care of the wild horses and burros (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B).

18.     The WHBA provides a criminal cause of action for "any person who processes or permits to be processed into commercial products the remains of a wild free-roaming horse and burro." 16 U.S.C. § 1338(a)(4).

### 2.     BLM Regulations Regarding the Protection, Management, and Control of Wild Free-Roaming Horses and Burros.

19.     BLM regulations provide for the management of wild horses and burros "as an integral part of the natural system of the public lands under the principle of multiple use; protection from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros." 43 C.F.R. § 4700.0-2.

20.     BLM's management activities affecting wild horses and burros shall be undertaken with a goal of maintaining free-roaming behavior. 43 C.F.R. § 4700.0-6.

4

21.     BLM defines qualification standards for private maintenance of wild horses and burros as "proper care and humane treatment to excess wild horses and burros by a qualified individual under the terms and conditions specified in a Private Maintenance and Care Agreement." 43 C.F.R. § 4700.0-5(i).

22.     BLM has the authority to ensure compliance by the adopter with the terms and conditions of the Private Management and Care Agreement ("Agreement") and applicable regulations and has the duty to conduct investigations when the Agency receives complaints concerning the care, treatment, or use of a wild horse or burro. 43 C.F.R. § 4760.1(a), (c).

23.     BLM is under a duty to determine whether an individual is qualified to receive a wild horse or burro for private maintenance.

24.     To qualify to receive a wild horse or burro for private maintenance, an individual shall have no prior conviction for inhumane treatment of animals or for violation of the Wild Free-Roaming Horse and Burro Act or regulations. 43 C.F.R. § 4750.3-2(a)(2).

25.     BLM must determine that the individual who obtains a wild horse or burro for private maintenance has adequate feed, water, and facilities to provide humane care to the number of animals requested and ensure the facilities that house the wild horse and burro are in safe condition and sufficient strength and design to contain the animals. 43 C.F.R. § 4750.3-2(a)(3).

26.     BLM sets minimum standards for each facility housing wild horses and burros. BLM ensures private individuals' facilities meet these standards, including: a minimum space of 144 square feet for each animal maintained if exercised daily, or 400 square feet otherwise; that, until fence broken, adult horses shall be maintained in an enclosure at least six feet high; burros in an enclosure at least four and a half feet high; and horses less than eighteen months old in an enclosure at least five feet high. The materials

"shall be protrusion free and shall not include large-mesh woven or barbed wire." 43 C.F.R. § 4750.3-2(a)(3)(i)-(ii).

27.     BLM regulations state shelter shall be available to the wild horses and burros to mitigate the effects of inclement weather and temperature extremes, and the authorized officer may require that the shelter be a well-drained and adequately ventilated structure. 43 C.F.R. § 4750.3-2(a)(3)(iii).

28.     BLM regulations require that the "feed and water shall be adequate to meet the nutritional requirements of the animals, based on their age, physiological condition and level of activity." 43 C.F.R. § 4750.3-2(a)(3)(iv).

29.     Adopters are financially responsible for proper care and treatment of all wild horses and burros covered by the Agreement. 43 C.F.R. § 4750.4-1.

30.     It is the duty of BLM for one year after adopters apply for title to determine whether the adopter has complied with the terms and conditions of the Agreement, and that the animals covered by the Agreement have received proper care and humane treatment based on the determination of BLM through "field inspection, a statement provided by the adopter from a veterinarian, extension agent, local humane official, or other individual acceptable to the authorized officer." 43 C.F.R. § 4750.5(b).

31.     "An adopter may not obtain title to more than 4 animals per 12-month period of private maintenance" unless specifically authorized in writing by the authorized officer. 43 C.F.R. §§ 4750.3-2(a)(4), 4750.5(c).

**B.      The National Environmental Policy Act.**

**1.      Statutory Provisions.**

32.     NEPA is our nation's basic charter for environmental protection.

33.     Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be

informed about, and to comment on, the environmental impacts of proposed agency actions. *See* 40 C.F.R. § 1500.1.

34.    NEPA requires federal agencies to analyze the environmental impacts of a particular federal action before proceeding with the action. *See* 42 U.S.C. § 4332(2)(C).

35.    Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects; [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

36.    The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

**2.    Regulatory Provisions.**

37.    The BLM NEPA Handbook states that a BLM proposal constitutes a federal action, and thus NEPA applies, when: (1) [BLM has] "a goal and [is] actively preparing to make a decision on one or more alternative means of accomplishing that goal (40 C.F.R. § 1508.23); (2) the proposed action and effects are subject to BLM control and responsibility (40 C.F.R. § 1508.18); (3) the action has effects that can be meaningfully evaluated (40 C.F.R. § 1508.23); and (4) effects of the proposed action are related to the natural and physical environment, and the relationship of people with that environment (40 C.F.R § 1508.8; 40 C.F.R. § 1508.14). BUREAU OF LAND MGMT., H-1790-1: NATIONAL ENVIRONMENTAL POLICY ACT PROGRAM 13 (2008).

38.    Major federal actions are further defined as actions including new and continuing activities, including projects and programs entirely or partly financed, assisted,

conducted, regulated, or approved by federal agencies, or new or revised rules, regulations, plans, policies, or procedures. 40 C.F.R § 1508.18(a).

39.     Major federal actions also include the "adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R 1508.18(b)(3).

40.     Whether an agency action is "significant" enough to require the preparation of an EIS involves "consideration of both context and intensity." 40 C.F.R. § 1508.27.

41.     The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

42.     Intensity "refers to the severity of impact" and requires BLM to consider several factors, including: impacts of the action; unique characteristics of the geographic area; the degree to which the effects on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R § 1508.27(b).

**C.     The Administrative Procedure Act.**

43.     The Administrative Procedure Act (APA) governs the internal procedures of administrative agencies and how they interact with the public when issuing rules and orders. The APA defines an "agency" to mean "each authority of the Government of the United States," unless expressly excluded by the Act.

44.     BLM is not expressly excluded from the APA.

45.     The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

46.     The APA defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

47.     The APA defines "rulemaking" is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

48.     Before issuing a rule, an agency must publish notice of the proposed rulemaking in the Federal Register, "unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b).

49.     The notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* §§ 553(b)(1)-(3).

50.     After notice, the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. 5 U.S.C. § 553(c). The agency must publish notice of a legislative or substantive rule at least thirty days before its effective date, except for "(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretative rules and statements of policy; or (3) as otherwise provided by the agency for good cause found and published with the rule." *Id.* § 553(d).

51.     The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2).

**FACTUAL BACKGROUND**

**A.**     **BLM Historical Actions Concerning Wild Free-Roaming Horses and Burros, 1971-2010.**

52.     BLM is statutorily authorized to remove excess wild horses from the range to maintain a thriving natural ecological balance.

53.     The 1971 WHBA authorized BLM to destroy wild horses and burros in the most humane manner possible.

54.     In 1978, Congress passed the Public Rangelands Improvement Act ("Range Act"). The Range Act provides for the adoption of excess horses. BLM is not authorized to sell or transfer a horse for consideration for processing into commercial products.

55.     In December of 2004, Congress passed the Sales-Authority Act, otherwise known as the Burns Amendment, which stated that any excess horse or burro, or the remains of such, shall be sold if the horse is more than 10 years of age or if the horse has been offered unsuccessfully for adoption at least three times.

56.     The amendment further stated that any horse meeting these criteria would be sold without limitation, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities, until all excess horses were sold, or herd management areas (HMAs) reached appropriate management levels.

57.     The Department of the Interior FY 2005 Omnibus Appropriation Act (PL 108-447, Division E, Title 1, Section 142) amended the WHBA (Public Law 92-195) further and stated that BLM has the authority to direct that horses "be humanely captured and removed for private maintenance and care for which [the Secretary] determines an adoption demand exists by qualified individuals, and for which he can assure humane treatment and care (including proper transportation, feeding, and handling)."

58.     BLM's Instruction Memorandum (IM) No. 2005-101 negotiated the sale of excess wild horses through the National Point of Contact (NPOC) or direct sales by the Group Managers. For direct sales, Group Managers were not permitted to sell more than four animals for purchase and were directed to refer such requests for more than four wild horses or burros to the NPOC for further consideration.

59.     IM No. 2005-101 also specified that in negotiated sales, if evidence may indicate that a purchaser does not intend to provide a good home, the NPOC would contact the group manager, and vice versa for direct sales.

60.     From FY 2010 to present, Congress has included language in the Department of Interior's appropriations legislation prohibiting the use of federal funds "for the destruction of healthy, unadopted, wild horses and burros in the care of [BLM] or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products."

**B.     2012 BLM Policy Moves to Prevent Wild Horses from being Sold to Slaughter, and Failure of Prevention.**

61.     On December 18, 2012, BLM published IM No. 2013-032, which provided that without prior approval from the Assistant Director, no more than four wild horses or burros may be purchased by an individual or group within a six-month period.

62.     IM No. 2013-032 also stated that when buying wild horses or burros, the purchaser must describe where they intend to keep the animals for the first six months following the sale, and that without prior approval from the Assistant Director, BLM will not sell more than four animals destined for a single location in this six-month period, irrespective of who the purchaser or purchasers may be.

63.     On August 26, 2014, BLM adopted IM No. 2014-032, Guidance for the Sale of Wild Horses and Burros.

64.     IM No. 2014-032 stated that "[i]n recent years the sales program has received a lot of public scrutiny. This policy was developed to provide additional assurances that animals will not be processed into commercial products."

65.     IM No. 2014-032 required that requests from individuals or groups to purchase more than four animals in a six-month period need to be approved by the Assistant Director, Resources and Planning. Individuals interested in purchasing more than four animals in a six-month period are required to submit a proposal detailing where animals will be kept, plans to provide humane care, including: adequate forage, water, hoof and veterinary care, fencing, and the intended use for the animals.

66.     IM No. 2014-032 also required the facility managers to search the purchaser's name in the Wild Horse and Burros Program System (WHBPS) before the sale to determine if any documented notes existed in the system.

67.     Under IM No. 2014-032, where evidence may indicate that a purchaser does not intend to provide a good home, the Facility Manager will deny the sale and document the reason for doing so. The Facility Manager will also notify the Washington Office (WO) Wild Horse and Burro Sales Program Lead so that other facility managers can be advised of the situation and prevent such buyers from shopping from facility to facility.

**C.     2015 Inspector General Report on BLM Failures to Protect Sold Wild Horses.**

68.     The Department of the Interior Office Inspector General released a report to the public on October 23, 2015, outlining its investigation of BLM's sale of approximately 1,700 wild horses from 2008 through 2012 to a single rancher that resulted in the wild horses being sent to slaughter for processing into commercial products.

69.     The investigation began on October 11, 2012.

70.     The investigation reported that the marketing specialist said that for each purchase of a wild horse or burro, the rancher in question signed a bill of sale with BLM

12

stating that he agreed not to knowingly sell or transfer ownership of any wild horse or burro to any person or organization with the intent to resell the animal to slaughter.

71.     The marketing specialist further stated that she contacted the rancher whenever she received a complaint about him sending the horses to slaughter, and that each complaint was reported to BLM Office of Law Enforcement (OLE). The rancher denied the allegations, told OLE that the horses were not slaughtered and went to good homes, and OLE found no evidence of the rancher selling the horses to slaughter.

72.     However, a 2012 NBC news article reported that the rancher had sought investors for a slaughterhouse.

73.     According to the Inspector General Report, the rancher said that he purchased horses from BLM by the truckload, which typically consisted of 35 horses, and paid $10 per horse. He said he could sell a load of 35 horses for about $3,500 to $4,000 and make $2,500 to $3,000 in profit on each sale. He also said that if he could obtain more horses, he would have taken them directly to Mexico himself because he could sell them for $100 each there.

74.     Despite receiving information between 2009-12 that the rancher sent horses to slaughter, Wild Horse and Burro Program officials said there was no evidence of wrongdoing to prompt them to stop selling to the rancher or to conduct further background checks or inspections.

75.     The report found that Wild Horse and Burro managers failed to enforce BLM's policy of limiting the sale of horses and ensuring that the horses went to good homes.

76.     By the middle of 2016, numerous investigatory news articles had begun to document the failure of BLM's Wild Horse and Burro Program. These reports generally focused on BLM's decision to continue to round up horses from the range and the huge costs associated with these roundups and long-term storage of horses.

77.     In September 2016, the National Wild Horse and Burro Advisory Board, a nine-member body that makes no binding decisions, voted to recommend that BLM euthanize or sell all unadopted wild horses and burros in government holding facilities, approximately 45,000 wild horses at that time, further demonstrating the lack of protection or care BLM affords wild horses and burros.

**D.     2018, BLM Attempts to Weaken Legal Protection for Wild Free-Roaming Horses and Burros and to Encourage Adoptions and Sales.**

78.     By 2018, BLM had removed tens of thousands of wild horses from federal public lands in the western United States.

79.     Due to legal restrictions on the slaughtering of removed horses, horses taken from public lands are housed at BLM holding facilities or on private ranches contracted to store horses.

80.     The extent of BLM's holding of horses removed from public lands, and the cost to taxpayers, has been documented by the Wall Street Journal, The Economist, and The Guardian.

81.     Up until 2018, BLM had not had great success of finding private homes for the large number of wild horses that were being removed from public lands.

82.     In 2018, BLM filed a report with Congress regarding its Wild Horse and Burro Program.

83.     BLM requested that Congress grant BLM the authority to sell wild horses and burros without limitation. To do so, BLM asked Congress to amend the WHBA to consider actions such as eliminating provisions in the WHBA that limit adoptions to only four animals per year; reducing the time to title an adopted wild horse or burro from one year to six months; and providing for the transfer of wild horses and burros to nonprofit organizations or other countries for humanitarian purposes or to promote economic

development outside of the United States and that such transfer would cause animals to lose their protected status under the WHBA.

84.     BLM's Report to Congress further requested that specific actions be categorically excluded from detailed analysis under NEPA, including, but not limited to: (1) all roundups and removals, including emergency roundups; (2) the unrestricted sale of wild horses and burros for which an adoption demand does not exist, as determined by BLM; and (3) euthanasia of healthy wild horses and burros for which an adoption or sale demand does not exist, as determined by BLM.

85.     BLM's Report to Congress focused on placing horses and burros that are rounded up into "private care" through adoptions and sales, including international sales to countries for agricultural, law enforcement, park management, and other uses. This option would specifically allow BLM to sell without limitation or euthanize any wild horses or burros that were not placed in "private care."

86.     While Congress did not act on any of BLM's requests, BLM internally proposed a 2018 Wild Horse Sale Rule ("2018 Rule") to eliminate most protections for wild horses and burros.

87.     The purpose of the 2018 Rule was to "increase the number of sale-eligible animals in off the range corrals open to the public," and ordered BLM to "approve sales of excess animals to individuals, companies, and organizations." The 2018 Rule called for an increase of public adoption events at corrals that previously were either extremely limited access or completely closed to the public. It also placed an emphasis on using technology to increase the number of adoption events, but did so in a way that reduced the likelihood of adoptions while increasing the number of wild horses available for sale.

88.     The 2018 Rule also increased the number of wild horses that BLM could sell without prior approval from no more than four in a six-month period to more than twenty-five, deleted the requirement that a purchaser's name shall be searched in the WHBPS to

determine if there are any documented notes against that purchaser, and deleted the requirement that when there is evidence that a purchaser may not provide a good home, that "the Facility Manager will then notify the Washington Office (WO) Wild Horse and Burro Sales Program Lead so that other Facility Managers can be advised of the situation and prevent such buyers from shopping from facility to facility."

89.     Due to the reduction in safeguards against slaughter by the 2018 Rule, Friends of Animals (FoA) sued the U.S. Secretary of the Interior and BLM for failure to conduct notice and comment rulemaking, failure to provide a reasoned explanation for rule change, and for violations of the 2018 Consolidated Appropriations Act.

90.     On April 2, 2019, both parties entered a joint stipulation of voluntary dismissal without prejudice, thereby reinstating the policies, procedure, and guidance set forth in IM No. 2014-032.

**E.     2019-Present, BLM Further Seeks to Undermine Protections of Wild Free-Roaming Horses and Burros through Implementation of the Adoption Incentive Program.**

91.     On January 30, 2019, BLM implemented the Adoption Incentive Program (AIP) through IM No. 2019-025, which encourages new individuals and organizations, regardless of knowledge about the animals, to adopt a wild horse or burro.

92.     All untrained animals are available for adoption under the AIP.

93.     BLM is offering a financial incentive of $1,000 total per animal adopted, along with a minimum adoption fee of $25 per animal.

94.     BLM may allow each adopter participating in the AIP to adopt and maintain a maximum of four animals total, but as each participating animal is titled after the year-long waiting period, BLM may allow an adopter to adopt additional animals, up to a maximum of four untitled animals at any one time through the AIP, significantly reducing protections against hordes of wild horses and burros being sent to slaughter.

95.    All adopters are required to sign an Adoption Incentive Agreement, which includes that the animals will be treated in a humane manner and placed into good, caring homes.

96.    Per IM No. 2019-025, BLM employees or approved individuals should conduct compliance inspections on wild horses and burros adopted through the AIP and should remove any adopter from eligibility who does not adhere to the terms and agreements of the Adoption Incentive Agreement, or who returns two or more animals within a twelve-month period.

97.    Adopters sign a contract under penalty of perjury that they will not sell the animals directly or indirectly to slaughter.

98.    Despite the terms of the AIP contract, an article published by the New York Times on May 15, 2021, revealed that wild horses and burros adopted under the AIP were dumped at slaughter as soon as the adopters obtained full payment and title to the animals from the government.

99.    The BLM's AIP allows adopters who sell horses to kill-buyers at auctions to continue adopting wild horses and burros.

100.    The adoption process is not selective, as the article discovered one man who received federal money from the AIP, even though he had gone to prison for kidnapping and beating two men during a horse slaughter deal gone wrong.

101.    The article also discovered a family who received $20,000 for mustangs adopted through the AIP that ended up in Texas at a livestock auction frequented by kill-buyers.

102.    Many horses bearing the government AIP brand show up at slaughter auctions after title is transferred.

103.    Wild horses who have been rescued by animal rights groups from these slaughter auctions are emaciated and have not been treated or groomed. Wild horses

adopted through the AIP program are subjected to severe neglect, including horses found living in a dog pen, horses standing in five inches of mud, and even some horses with severe sores and neck injuries. Other horses adopted through the AIP are returned or repossessed by BLM due to findings of inhumane treatment.

104.    BLM officials turn a blind eye to these issues and ignore the fates of wild horses and burros. Compliance checks are required, but FOIA documents revealed that the checks are questionably conducted and do not occur in a timely manner.

105.    Senator Diane Feinstein, in response to the New York Times article, called on the Secretary of the Interior and the Interior Department to suspend its Wild Horse and Burro Adoption Incentive Program:

> I write with great concern regarding the attached New York Times article, which indicates that the Department of the Interior's Bureau of Land Management (BLM) Wild Horse and Burro Adoption Incentive Program has provided federal incentive payments to adopters who abandoned these animals at slaughter auctions. I strongly urge BLM to immediately suspend this program and conduct a thorough investigation to ensure federal funds are used to protect wild horses and burros against abuse, neglect, or slaughter, as intended by Congress.
>
> Although adopters sign a contract swearing under penalty of perjury that they will not sell adopted wild horses and burros directly or indirectly to slaughter, this report suggests that some adopters have done exactly that and BLM has failed to use all appropriate tools to enforce its contracts and prevent adopters who previously sold their wild horses to slaughter auctions from adopting again.
>
> Subsidizing the slaughter of wild horses and burros with taxpayer dollars violates Congressional intent outlined in the Fiscal Year 2021 Consolidated Appropriations Act (Public Law 116 260), which prohibits the use of funds for the destruction of wild horses and burros and directs BLM to adopt a robust expansion of proven, safe, effective, and humane fertility control methods to manage these herds.
>
> It is my hope that you will immediately halt the Adoption Incentive Program and ensure a proper investigation is conducted to prevent future wild horses and burros from suffering abuse or slaughter. Thank you for your attention to this important matter and I look forward to working with you to ensure humane outcomes for wild horses and burros.

## FIRST CAUSE OF ACTION

### (Failure to Conduct Notice and Comment Rulemaking)

106.     Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

107.     In issuing the AIP, BLM issued a new rule that creates rights and duties. The AIP changes the criteria adopting wild horses, creates specific obligations for parties seeking to adopt horses, and establishes a right to adopt horses when the specified criteria are met.

108.     In issuing the AIP, BLM failed to comply with the notice and comment rulemaking requirements of the APA.

109.     In issuing the AIP, and revoking previous policies, BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the AIP should be set aside under the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (Violations of Congress' Prohibition on the Slaughter of Wild Horses)

110.     Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

111.     The 2019, 2020, and 2021 Consolidated Appropriations Acts prohibit the sale of wild horses and burros that results in their destruction for processing into commercial products.

112.     In authorizing the AIP, BLM removed safeguards essential to compliance with the 2019, 2020, and 2021 Consolidated Appropriations Acts.

113.     The AIP will likely lead to the sale of wild horses and burros that could result in their destruction for processing into commercial products.

114.     BLM's issuance of the AIP is arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure. As such, the AIP should be set aside under the APA, 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION**

**(Violation of NEPA: Failure to Take a Hard Look at the Impacts of the Proposed Actions)**

115.     Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

116.     Wild horses live in highly structured, hard-won family groups, are acutely tuned to dangers in their environment, and are wary of humans. They have developed ways to protect their herds from other animals, including other wild horses, through communication and aggressive behavior.

117.     The implementation of the AIP to foster the removal of wild horses and burros from their natural habitat is a major federal decision affecting the quality of the human environment.

118.     The implementation of the AIP is an adoption of a program under 40 C.F.R. § 1508.18.

119.     BLM failed to analyze the highly controversial effects and uncertain or unknown risks of the AIP, such as the adoption-to-slaughter pipeline.

120.     BLM failed to analyze whether the AIP incentivizes BLM to remove more wild horses and burros from the wild.

121.     BLM failed to analyze whether the AIP will have an adverse impact on the population of wild horses and burros.

122.     BLM failed to analyze the impact the AIP will have on the number of effective breeding animals to maintain an acceptable level of diversity within the wild horse population.

123.    BLM knew or should have known, from past controversies involving the WHBA, that the AIP would cause wild horses and burros to be sent to slaughter.

124.    BLM failed to analyze the degree to which the informal adoption-to-slaughter pipeline may establish precedent for future actions with significant effects on the environment.

125.    On the above facts and legal obligations, Defendant violated NEPA by failing to independently and adequately analyze the direct, indirect, cumulative, and site-specific effects of the AIP.

126.    In issuing the AIP, without a complete and independent analysis of the direct, indirect, cumulative, and site-specific impacts of the proposed action and alternative actions, Defendant's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

///

///

///

**REQUEST FOR RELIEF**

Friends of Animals respectfully requests that the Court enter judgment providing the following relief:

A. Declare that BLM's issuance of the AIP is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the APA;

B. Vacate BLM's AIP until such time as Federal Defendants have complied with the law;

C. Enjoin BLM from adopting out or selling any wild horses pursuant to the AIP until such time as BLM has complied with the law;

D. Award Plaintiff reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

E. Grant such further relief as the Court deems just and equitable.

Dated: June 14, 2021

Respectfully submitted,
s/Michael Ray Harris

Michael Ray Harris
General Counsel &
Director, Wildlife Law Program
Friends of Animals

7500 E. Arapahoe Road, Suite 385
Centennial, Colorado 80112
Phone: 720-949-7791
Fax: 888-236-3303
www.friendsofanimals.org

*Attorney for Plaintiff*